## COMMONWEALTH *vs.* ROBERT FERREIRA.

Barnstable. February 9, 1994. - April 25, 1994.

Present: WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal,* Instructions to jury. *Intoxication. Joint Enterprise. Malice. Kidnapping. Robbery. Homicide. Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions.

At a criminal trial the judge's instructions to the jury on the issue of voluntary intoxication as it related to the specific intent necessary to sustain a conviction on a joint venture theory did not create a substantial likelihood of a miscarriage of justice with respect to the indictment for murder in the first degree, nor did they create a substantial risk of a miscarriage of justice with respect to the indictments for kidnapping and unarmed robbery. [595-597]

At a murder trial there was no error in the judge's instructions to the jury on malice and the Commonwealth's burden of proof. [597-598]

At the trial of an indictment for first degree murder, there was no error in the judge's refusal to instruct the jury on manslaughter, where no view of the evidence would permit such a verdict. [598-599]

At a criminal trial the judge's failure to give an instruction on the voluntariness of the defendant's statements to private citizens was not error, where the question of voluntariness of those statements was not an issue at trial. [599-600]

INDICTMENTS found and returned in the Superior Court Department on July 16, 1987.

The case was tried before *John J. Irwin, Jr., J.*

*Bruce Ferg* for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

ABRAMS J. Convicted of murder in the first degree on the grounds of deliberate premeditation and extreme atrocity or

cruelty, the defendant, Robert Ferreira, appeals.[1] The defendant alleges error in the instructions to the jury. He requests that we exercise our power under G. L. c. 278, § 33E (1992 ed.), to order a new trial or to reduce the verdict to murder in the second degree. We conclude that the convictions should be affirmed, and that there is no basis to exercise our power under G. L. c. 278, § 33E, on the conviction of murder in the first degree, and to order a new trial or enter a lesser degree of guilt.

*Facts.* On June 2, 1987, police discovered the victim's body, partially submerged in the water of the Cape Cod Canal. The victim's hands were bound behind his back. His legs were wrapped with automobile jumper cables attached to a metal tool box. An autopsy revealed that the cause of death was drowning, associated with a blunt impact injury. A medical examiner testified that injuries to the victim's head and nose were inflicted while the victim was still alive. The medical examiner further testified that the victim would have been unable to swim due to the ligatures around his hands and feet.

The police learned that the victim's automatic teller machine (ATM) bank card had been used to withdraw $200 in the early morning hours of June 2, 1987. Police developed photographs taken by surveillance cameras at the ATM machine. The defendant was identified from these photographs as the man withdrawing the money.

John Winters and Anthony Leite, two friends of the defendant, testified that on the evening of June 1, they drove the defendant and Kevin Galford[2] to a rest area on Route 140. The defendant and Galford said they wanted to go to the rest area to collect some money owed to them. Leite and Winters both testified that the defendant appeared sober.

---

[1] The defendant also appeals from his convictions of kidnapping and unarmed robbery. He makes no separate argument on those convictions.

[2] Kevin Galford was tried separately and convicted of murder in the first degree, kidnapping, and unarmed robbery. See *Commonwealth* v. *Galford,* 413 Mass. 364 (1992), cert. denied, 113 S.Ct. 1010 (1993).

Leite stated that he thought they might have gone to the rest area to beat up homosexuals.

At about 10 A.M. on June 2, 1987, the defendant and Galford, driving a blue Pontiac 6000, the same model of automobile owned by and registered to the victim, went to the home of Tammy Ferris. The defendant bought food and drinks for a cookout. At the cookout, the defendant told Ferris that he got $200 to burn the Pontiac. The defendant said that he and Galford took the automobile to Cape Cod the night before, throwing certain papers out the window on the way.[3] Ferris also testified that the defendant asked, "Where do you think we got the car or all this money? You think we drowned someone for this?"

Rebecca Carpenter, a friend of the defendant, testified that she went for a ride with the defendant on the morning of June 2, 1987, and that she noticed both front seats of the Pontiac were wet. Carpenter accompanied the defendant to New York to visit his father from June 3 to June 12, 1987. While in New York, the defendant told Carpenter that he and Galford had robbed and drowned the victim. According to Carpenter, the defendant said that he and Galford went to the rest area on Route 140 and picked up the victim. They then took the victim's car, made him withdraw $200, and drowned him in the canal. Carpenter said that the defendant told her he wanted to kill Galford for talking too much about the incident.

After an arrest warrant was issued, the defendant turned himself in at the Taunton police station. Officer James Cummings testified that the defendant initially denied the murder. He said that Galford had given him $200 and the keys to the Pontiac, telling him to burn the car. When the defendant was shown the photographs taken at the ATM machine, he turned his head away and admitted, "I did it, but Galford was with me." Later, while being transported in a police cruiser, the defendant asked about Galford. When he was

---

[3]The victim's registration and other papers were found by the side of the road near the Route 140 rest stop.

told Galford was not under arrest for murder, he became up-
set and shouted, "I'm not going down for this alone. He was
there with me." The defendant also told the police that, un-
like Galford, he had a "conscience" and had not "slept a
night since this happened." The theory of defense was that
the defendant was paid $200 for an "insurance job" to get
rid of the car, and that Galford, alone, had committed the
murder.[4]

*Discussion.* The only issues the defendant raises on appeal
concern the judge's jury instructions. The defendant did not
object to the instructions at trial. We therefore review the
challenged instructions, pursuant to G. L. c. 278, § 33E, to
determine whether the instructions created a "substantial
likelihood of a miscarriage of justice." We view the charge to
the jury in its entirety "since the adequacy of instructions
must be determined in light of their over-all impact on the
jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232
(1980).

1. *Joint venture.* The defendant asserts that the judge
should have instructed the jury that they could consider evi-
dence of the defendant's intoxication in assessing whether the
defendant was capable of forming the specific intent neces-
sary to sustain a conviction on a joint venture theory. The
defendant argues that *Commonwealth* v. *Parker*, 402 Mass.
333, 336-337 (1988), requires an instruction that the jury
may consider evidence of voluntary intoxication with respect
to joint venture. Contrary to the defendant's assertion, we
left open the question "whether a separate intoxication in-
struction on the ability to form a shared intent is required
when the Commonwealth argues a joint enterprise theory at
trial." *Parker, supra* at 336. Nothing the judge said pre-
cluded the jury from considering evidence of intoxication on
the defendant's ability to form a shared intent.
Cf. *Commonwealth* v. *Glass*, 401 Mass. 799, 809-810
(1988).

---

[4]The defendant did not testify at his trial. But see *Commonwealth* v.
*Galford, supra* at 367-368.

The judge correctly instructed the jury on the elements of joint venture.[5] See *Commonwealth* v. *Mandile*, 403 Mass. 93, 99-100 (1988). The judge then made the following reference to specific intent: "Now, bear in mind, when we get into the second phase of my instructions, that I'm going to lay out for you the specific intent required to be proved with reference to the crimes of murder, unarmed robbery, and kidnapping." At that point, the judge then reiterated the elements of joint venture, which properly included "sharing with the perpetrator of the crime the required mental state or intent to commit that particular crime." The judge's instructions made clear that in order to sustain a conviction, the Commonwealth must prove that the defendant shared the specific intent necessary for murder, unarmed robbery and kidnapping. During his instructions, the judge repeatedly told the jurors that the defendant's sobriety or lack of sobriety was a factual determination. The judge explicitly linked the element of specific intent with the defendant's intoxication.[6]

---

[5]The judge told the jury that, in order to prove the defendant guilty of a crime committed by joint venture, the Commonwealth must prove that the defendant "aided or assisted in the commission of the crime, or stood by willing and able to help the crime if it became necessary; and second, that the defendant did so while sharing the intent required to commit that particular crime."

[6]The judge repeatedly told the jurors that the issue of the defendant's sobriety was a fact issue for them. In the course of his instructions he said: "[I]t's open for you to consider all of the evidence; including any evidence of the defendant's intoxication on the issue of whether or not the Government [h]as proved, for example, the specific intent required in the concept of malice aforethought and the ability to deliberately premeditate in the concept of deliberately premeditated murder.

"  .  .  .

"The Commonwealth must prove beyond a reasonable doubt that the defendant was not so overcome by alcohol that he was sufficiently capable of deliberately premeditating before you may find him guilty of deliberately premeditated murder in the first degree."

His instructions on extreme atrocity or cruelty included the following statements: "Any evidence with reference to the condition of the defendant as it relates to sobriety at the time of the acts being perpetrated, if, in fact, there is evidence of that before you; and again, the Commonwealth doesn't have to prove beyond a reasonable doubt that the defendant was completely sober, or that he had not consumed alcohol at the time of the

The judge's instruction did not create a substantial likelihood of a miscarriage of justice on the indictment for murder in the first degree, see G. L. c. 278, § 33E, nor did the instructions create a substantial risk of a miscarriage of justice on the crimes of kidnapping and unarmed robbery. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987).

2. *Malice.* The defendant alleges error in the judge's definition of malice. We set forth the challenged instruction in the margin.[7] The defendant claims that the instruction was

---

events in question, or drugs; but the Commonwealth must prove by the facts and the evidence presented to you and any inferences you might draw from those facts beyond a reasonable doubt that the defendant was capable of acting and did act with extreme atrocity or cruelty before you can find him guilty of first degree murder, of course, committed with extreme atrocity or cruelty."

The instruction on unarmed robbery included the following statements: "[T]he Government has to prove that this defendant beyond a reasonable doubt, either himself or in a joint criminal venture where he shared the same intent as the principal, intended to steal money from [the victim] - or property from [the victim] on that day; took it either from his person or from his immediate control by the use of force or by the threatened use of force that was intentionally inflicted on [the victim]. And quite obviously, in determining intent, you have a right to consider all of the evidence that has been presented to you in determining whether or not the Government has proved intent; including the intoxication, if any, of the defendant at the time . . . ."

On the kidnapping charge he said, "You have to be satisfied beyond a reasonable doubt based on all of the evidence, including the sobriety or lack of sobriety of the accused at the time that this crime was purportedly committed, and determine whether or not he had the specific intent to first of all, to unlawfully confine and imprison."

[7]"What is malice? It's a state of mind w[hich] includes not only anger, hatred, and revenge; but every other unlawful and unjustifiable motive. However, malice does not necessarily imply ill will toward the person killed; although quite obviously, that could be the case. Any intentional killing of a human being, any intentional killing of a human being without legal justification or excuse, with no extenuating circumstances sufficient in· law to reduce the crime from murder to manslaughter, is malicious within the meaning of malice aforethought.

"Malice aforethought includes any unexcused intent to kill, any unexcused intent to do grievous bodily harm, or to do any act creating a plain and strong likelihood that either death or grievous bodily injury would ensue. Malice aforethought, ladies and gentlemen, may be inferred if, in the circumstances known to the defendant at the time, a reasonably prudent person would have known that according to common experience, there was

incorrect because it was "overbroad and drastically lowers the threshold for a finding of malice aforethought; and . . . did not give any guidance to the jurors as to what constituted 'extenuating circumstances sufficient in law to reduce the crime to manslaughter.' " We do not agree.[8]

The language challenged by the defendant is almost identical to the instruction in *Commonwealth* v. *Adrey,* 397 Mass. 751, 754 (1986). It is clear that the judge accurately conveyed the Commonwealth's burden to the jury. The judge correctly defined the three prongs of malice. *Commonwealth* v. *Moore,* 408 Mass. 117, 134 n.9 (1990). The language did not suggest that malice was presumed or implied. Cf. *Commonwealth* v. *Starling,* 382 Mass. 423, 428 (1981). Further, the judge repeatedly emphasized the Commonwealth's burden to prove each element of the crimes charged, and the defendant's presumption of innocence. See *Commonwealth* v. *Doucette,* 391 Mass. 443, 451-452 (1984); *Commonwealth* v. *Medina,* 380 Mass. 565, 578 (1980). There was no error.

3. *Failure to instruct on manslaughter.*[9] The defendant asserts that the jury should have been permitted to consider a verdict of manslaughter. The defendant argues that because the jury could have found that the element of malice was absent due to his voluntary intoxication, he was entitled to a manslaughter instruction.

A judge must give an instruction on manslaughter if any view of the evidence will permit a finding that the offense was manslaughter. See *Commonwealth* v. *Martinez,* 393 Mass. 612, 613-614 (1985). In this case, no view of the evidence would permit such a verdict. An instruction on voluntary manslaughter was not appropriate because there was no

---

a plain and strong likelihood that death would follow the contemplated act. So, ladies and gentlemen, that's the definition of malice aforethought."

[8]The defendant was not entitled to an instruction on manslaughter. See *infra* at 598-599.

[9]At the charge conference, the judge inquired of defense counsel, "What evidence is there of any manslaughter?" Defense counsel replied, "I don't believe there is, Judge." Appellate counsel was not counsel at trial.

evidence of provocation. See *Commonwealth* v. *Parker*, 402 Mass. 333, 344 (1988).

An instruction on involuntary manslaughter was unwarranted because there was no evidence that this was an unintentional death during the commission of a battery. See *Commonwealth* v. *Sheppard*, 404 Mass. 774, 776 (1989). "A killing without malice does not automatically become involuntary manslaughter. The traditional elements of involuntary manslaughter must be shown by the evidence that the jury might believe before an instruction on involuntary manslaughter is required." *Commonwealth* v. *Sires*, 413 Mass. 292, 302-303 (1992). Here, as in *Sires*, evidence of wanton and reckless conduct amounting to involuntary manslaughter was not raised by the testimony. The risk of harm associated with throwing a person, tied up, into a canal is the kind of risk that could only lead to a determination of malice. *Sires*, *supra* at 303. There was no error in the judge's refusal to give a manslaughter instruction.

4. *The voluntariness of the defendant's statements to private citizens.* The defendant alleges error in the judge's failure to give an instruction on the voluntariness of his statements made to private citizens, specifically, statements made to Tammy Ferris and Rebecca Carpenter. The defendant concedes that he did not raise this issue at trial, but suggests that the judge should have given an instruction sua sponte.[10]

---

[10]The judge did instruct the jury with respect to the voluntariness of the defendant's statements made to law enforcement officials, as follows: "[Y]ou've heard testimony purportedly that dealt with statements made by the defendant at some time during the course of this investigation . . . the Government has to prove to the jury beyond a reasonable doubt that those statements were made by that defendant in what we describe as a voluntary way. . . .

"You've heard about statements allegedly made by the defendant in this case to law enforcement authorities concerning the offense for which he is charged in this case. . . . You can consider any such statements only if the Commonwealth has proved beyond a reasonable doubt that the defendant made the statement, and that the defendant made the statement voluntarily; that is, of his own free will and with a rational intellect." The judge then continued, at length, discussing what evidence the jury could consider in assessing the voluntariness of the statements.

The judge has no duty to ask the jury to pass on the voluntariness of the defendant's statements unless it is made a live issue at trial. *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978). See *Commonwealth* v. *Brady*, 380 Mass. 44, 55 (1980). Moreover, intoxication alone is not sufficient to negate an otherwise voluntary act. See *Commonwealth* v. *Parham*, 390 Mass. 833, 838 (1984); *Commonwealth* v. *Hooks,* 375 Mass. 284, 289 (1978).

The defendant offered no evidence of involuntariness of his statements to civilians. The witness, Rebecca Carpenter, testified that the defendant "smoked a little bit of pot" and drank "mostly beers and some Schnapps" while in New York. She did not state at what point during the nine days in New York he drank alcohol or used drugs. Nor did she state that he was intoxicated or incapacitated when he made the statements to her.[11] Tammy Ferris said that there was a case of beer at the cookout on June 2, 1987. She stated that each person at the party may have had "a few beers, if that." There was no evidence of drug use at the party.

Without evidence of involuntariness, the judge had no obligation to make a separate inquiry into the issue. *Commonwealth* v. *Benoit*, 410 Mass. 506, 513 (1991). *Commonwealth* v. *Harris*, 371 Mass. 462, 471 n.3 (1976). The question of voluntariness was "not 'raised with sufficient point to require an express admonition to the jury by the Court on its own motion.'" See *Commonwealth* v. *Brady*, *supra* at 55, quoting *Commonwealth* v. *Pratt*, 360 Mass. 708, 714-715 (1972). There was no error.

5. *General Laws c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and we con-

---

[11]The Commonwealth argues that the issue of voluntariness of statements to civilians "might be contrary to the theory and strategy of the defendant." *Commonwealth* v. *Benoit*, 410 Mass. 506, 513 (1991). Defense counsel's cross-examination of Rebecca Carpenter repeatedly suggested to the jurors that the defendant did not make the statements and that the witness was not telling the truth.

clude that justice does not require us to order a new trial or to reduce the verdict to a lesser degree of guilt.

*Judgments affirmed.*